UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLEVIS MITCHELL WORKMAN,

                Plaintiff,               Case No. 08-cv-11705

vs.                                DISTRICT JUDGE PAUL D. BORMAN
                                MAGISTRATE JUDGE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
==========================/

**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Clevis Mitchell Workman brought this action under 42 U.S.C. § 405(g) and §1383(c)(3) for judicial review of the Commissioner's final decision that Plaintiff was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act or Supplemental Social Security Income ("SSI") under Title XVI of the Social Security Act.  Both parties have filed motions for summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

### A.    Procedural History

Plaintiff previously received disability benefits from 1993 until 2001, when he was found to be no longer disabled (R. 29).  In a February 11, 2003, hearing decision, an Administrative Law Judge ("ALJ") affirmed the decision to cease Plaintiff's benefits, finding that, while Plaintiff could not perform his previous work as an auto worker, he was able to perform

1

medium-level work.

Plaintiff filed the present applications for DIB and SSI in December 2003,[1] alleging that he became disabled on January 1, 1998, by a brain aneurism, a broken right leg, neck pain, leg problems, and difficulty communicating (R. 18, 60, 84, 93). Through his attorney he subsequently amended his alleged onset date of disability to February 12, 2003 (R. 274). After Plaintiff's applications were denied upon initial review (R. 37-41, 263), an administrative hearing was held on June 14, 2006, at which Plaintiff was represented by his present attorney, Mikel Lupisella (R. 267). Vocational Expert ("VE") Pauline McEachin also testified (R. 290-293).

In a January 26, 2007, decision, Administrative Law Judge ("ALJ") David Mazzi found that Plaintiff was not disabled because there were a significant number of jobs in the national economy that he could perform (R 18-24). On February 23, 2008, the Appeals Council denied review of the ALJ's decision (R. 6-8), making the January 26, 2007, decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

**B.** **Background Facts**

**1.** ***Plaintiff's Testimony and Statements***

Plaintiff was 49 years old on February 12, 2003, when he alleges he became disabled (R. 60, 277). Plaintiff last worked in 1997 at GM as an hourly production employee (R. 67, 85, 281).

At the June 14, 2006, hearing, Plaintiff testified that in approximately 1998 he was injured in a bicycle accident involving a motor vehicle (R. 281). He stated that if he sits or

---

[1] The ALJ indicated that both of Plaintiff's applications were filed in August 2003, but it appears from the record that the application for disability insurance benefits was filed in December 2003 (R. 60-62). The application dates are not at issue in this civil action.

stands for more than 30 to 45 minutes he experiences pain (R. 282).  Plaintiff also stated that his speech has been slurred since the accident but is improving (R. 283-84).  Additionally, Plaintiff testified that he cannot lift more than 15 to 18 pounds (R. 284, 287).  Plaintiff reported problems with concentration, but when asked for examples, he described how he experiences leg cramps while watching TV (R. 289).  Plaintiff acknowledged abusing alcohol but claimed to be sober for five years (R. 288).

Plaintiff identified his current medications as hydrocodone for pain, atenolol for high blood pressure, and asosolate for cholesterol (R. 284).  He denied taking medication for depression and described his mental state as "getting better" and helped by his attendance at AA meetings (R. 285).  He stated that he wakes up at night from pain and that his medications make him tired (R. 286-87).  He reported napping one hour during the day (R. 287).

Plaintiff testified to cutting his lawn, which takes him about 6 hours because his hands hurt (R. 285-86).  He also reported watching TV, walking to church and cleaning his house (R. 287-89).

### 2.   *Medical Evidence*

In 2002 and early 2003 Plaintiff only received treatment at the Aleda E. Lutz VA Medical Center (VA Hospital).  In an April 2002 visit he reported having injured his right knee in a 1992 car accident, sustaining neck injuries in a 2001 car accident, and undergoing a bone graft to his leg and the insertion of pins and screws into two of his fingers after a 1996 car accident (R. 222).  Plaintiff  acknowledged prior alcohol abuse.  He was assessed as having stable hypertension, hyperlipidemia and osteoarthritis (R. 224).  His medications were reported to include celebrex, atenolol, and simvastatin for cholesterol (R. 223).  X-rays of the leg and

blood work were ordered, and Plaintiff was instructed to stop celebrex and instead prescribed salsalate, Tylenol #3 and amitriptyline for pain (R. 224).

An April 30, 2002, radiology report of the right tibia and fibula reported an "old healed fracture" and degenerative arthritis of the knee (R. 197).  An April 30, 2002, radiology report of the cervical spine found spondylosis at C5-C6 (R. 198).

In a follow-up visit five months later, Plaintiff complained of neck, hand and leg pain (R. 221).  Plaintiff's prescription for amitriptyline was increased, Tylenol #3 was continued, and salsalate was discontinued and replaced with etodolac for pain.  Four months later on January 22, 2003, Plaintiff again complained of neck, hand and leg pain.  He reported negative side effects from amitriptyline (R. 219).  Plaintiff's prescription for Tylenol #3 was discontinued and replaced with Vicodin to be used in conjunction with salsalate.  Plaintiff was counseled on the need for water therapy and home exercises; he was discharged from the pain clinic and ordered to follow-up with primary care.

One week later, Plaintiff returned for primary care orientation (R. 215).  Plaintiff reported walking frequently and denied fatigue (R. 215-16).  He complained of leg pain (R. 215). Plaintiff was ordered to continue with salsalate and amitriptyline and his prescription for Vicodin was increased to three times daily (R. 217).  Plaintiff was additionally placed on Celexa for depression.  Plaintiff was noted as having depression, osteoarthritis, a substance abuse disorder and chronic pain syndrome.  Two months later, Plaintiff complained of low back pain (R. 214). Plaintiff was prescribed lovastatin for cholesterol.  His prescription for Vicodin was renewed, and his prescription for amitriptyline was increased from 10 mg to 20 mg.

On April 9, 2003, Plaintiff was seen at the VA Hospital mental health clinic for depression, "primarily oriented around finances" and stemming from the cessation of his

disability benefits (R. 213). The addiction therapist advised Plaintiff to "stop looking to meds for relief" and instead instructed him to seek out natural means, such as walks, leisure activities and baths.

On June 11, 2003, Plaintiff first sought treatment from Charles Ellsworth, D.O., for leg and neck pain (R. 169). Plaintiff was prescribed Tylenol #3 and Xanax. Blood work taken on June 16, 2003, came back positive for cocaine and morphine (R. 178). Two weeks later, Plaintiff returned to discuss the lab results with Dr. Ellsworth (R. 166). Plaintiff denied using cocaine, stating he "hasn't used it in years."

In July 2003 Plaintiff was treated by Dr. Ellsworth for a bruised big toe and requested refills of his medications (R. 165). Dr. Ellsworth prescribed Keflex and Tylenol #3. On July 10, 2003, Plaintiff called Dr. Ellsworth's office, stating that his Xanax was stolen and that he "wants more" (R. 166). He was refused, with Dr. Ellsworth's notes stating, "No Pain Meds." Plaintiff returned later in the month, complaining of back pain and stating that in the past he had a brain aneurism (R. 164). Plaintiff was prescribed Tylenol #3 and Dr. Ellsworth noted "? cocaine abuse." Two days later on July 25, 2003, Dr. Ellsworth treated Plaintiff for "throbbing" in his right toenail and prescribed Tylenol #3 and Xanax (R. 162).

An MRI of the brain on August 6, 2003, ordered by Dr. Ellsworth, based on Plaintiff's slurred speech, revealed findings compatible with old infarcts but no evidence of acute processes (R. 246-47).

On August 7, 2003, Dr. Ellsworth treated Plaintiff further for his big toe injury and referred him to podiatry (R. 161). He was prescribed Keflex and Tylenol #3. Later in the month, Plaintiff asked Dr. Ellsworth for more Tylenol #3 (R. 160). Dr. Ellsworth instead prescribed Motrin, 800 mg.

In September 2003, Plaintiff returned to the VA Hospital and complained that Vicodin did not control his pain and requested an increase in medication (R. 211). He also complained of more depressive anxiety symptoms and requested a referral to mental health (R. 211-212). Plaintiff was assessed as having hypertension, hyperlipidemia, depression and degenerative joint disease. His medications were renewed, and he was referred to mental health (R. 212).

On September 11, 2003, Plaintiff was treated at the VA Hospital for depression (R. 207). Plaintiff complained of being on the "edge of a breakdown" and unable to wait until his scheduled appointment with mental health. Plaintiff was discharged in stable condition with no change to his medications, which included amitriptyline, atenolol, citalopram, hydrocodone, lovastatin and salsalate (R. 208). Plaintiff's depression was noted as "managed," and arrangements were made for a doctor's visit the next day (R. 209). Plaintiff did not keep the appointment due to transportation problems.

On September 18, 2003, Plaintiff returned to Dr. Ellsworth (R. 157-58). Dr. Ellsworth prescribed Tylenol #3 and ordered blood drawn (R. 159). Subsequent notes report that Plaintiff claimed to have lost the lab slip and did not get his blood drawn (R. 157-58).

On October 22, 2003, Plaintiff was treated at the VA Hospital as a walk-in, complaining of not sleeping well and feeling depressed due to "significant financial strain and a lot of health problems" (R. 207). Plaintiff reported not complying with his Celexa prescription. Plaintiff was ordered to take Celexa and additionally prescribed Seroquel for insomnia. Plaintiff was treated for a toothache the same day and advised to use salsalate (R. 205-06).

A week later, Plaintiff asked Dr. Ellsworth for refills (R. 158). Plaintiff was diagnosed as having hepatitis A. Dr. Ellsworth prescribed Tylenol #4, gave him a new lab slip and ordered blood drawn.

On November 13, 2003, Dr. Ellsworth treated Plaintiff, who requested Xanax refills (R. 157). Plaintiff was diagnosed with anxiety as well as hepatitis A and prescribed Xanax. Notes indicate that Plaintiff had still not had his blood drawn, as ordered. On December 3, 2003, Dr. Ellsworth prescribed Tylenol #4 (R. 156).

On December 15, 2003, Plaintiff was treated at both the VA primary care clinic and the mental health clinic for depression, brought on, he asserted, by the discontinuation of his social security benefits and foreclosure proceedings against his home (R. 203). To primary care, Plaintiff reported "doing fairly well" and "feel[ing] fine" (R. 202). To mental health, Plaintiff described feeling depressed "every day" since his benefits were cut off, experiencing panic attacks and crying spells, having trouble concentrating and making decisions, and feeling hopeless and helpless (R. 204). He complained of being tired and fatigued all the time. He rated his depression a 7-8 and his pain a 6 on a 10-point scale, with 10 being the worst. Modesto Sorroche, M.D., the VA psychiatrist, diagnosed Plaintiff with an adjustment disorder with mixed emotions and a mood disorder secondary to chronic pain. Dr. Sorroche prescribed Paxil, and Plaintiff's other medications were reviewed and renewed (R. 202-05). Plaintiff reported attending AA twice a week (R. 204).

On January 9, 2004, Dr. Ellsworth again treated Plaintiff, who requested refills (R. 155). Dr. Ellsworth reported that Plaintiff's big toe was "much improved." He prescribed Tylenol #4 and Xanax. The next month, Plaintiff requested refills and "stronger" Xanax (R. 154). Dr. Ellsworth prescribed Tylenol #4 and 1 mg of Xanax, up from .5 mg.

In March 2004, Dr. Ellsworth again treated Plaintiff, who brought in a police report relating to his prescriptions for Tylenol #4 and Xanax (R. 153). Plaintiff requested refills and was prescribed Lopid, Tylenol #4 and Xanax.

On March 20, 2004, Thomas Tsai, M.D., a state psychiatrist, interviewed Plaintiff, administered tests, and conducted a mental status evaluation (R. 138-141). He found that Plaintiff had a mood disorder secondary to pain coupled with a history of substance abuse (R. 138-140). He concluded that these limitations were not severe and only mildly affected Plaintiff's daily activities, social functioning, and concentration, persistence, and pace (R. 138-141).

On March 26, 2004, N. Sarti, a state examiner, reviewed the records and assessed Plaintiff's physical residual functional capacity (R. 142-49). He found that Plaintiff could occasionally lift 50 pounds and could frequently lift 25 pounds and had no other work limitations. (R. 217-222).

The next month Dr. Ellsworth treated Plaintiff for a twisted right foot, described by Plaintiff as painful (R. 151). Plaintiff requested and was prescribed both Tylenol #4 and Xanax. An x-ray of the right ankle revealed "an old fracture" but no present fracture or dislocation (R. 152).

On September 21, 2004, Robert Kuffa, M.D.,[2] Dr. Ellsworth's colleague, treated Plaintiff for degenerative disc disease and hepatitis A (R. 237). Plaintiff was prescribed Tylenol #4.

Dr. Kuffa treated Plaintiff again on October 12, 2004, for degenerative disc disease, hepatitis A and anxiety (R. 236). Plaintiff requested and was prescribed Xanax, 1 mg. Plaintiff stated that he talked with a psychiatrist at the VA Hospital. Later that month, Plaintiff requested and was prescribed Tylenol #4 (R. 235).

Dr. Kuffa saw Plaintiff again on November 26, 2004 (R. 234). Plaintiff complained of right leg pain and stated that he had been in jail for domestic violence. He was treated for

_____

[2] The treating notes marked as pages 226 to 237 of the Administrative Record are identified as Dr. Kuffa's (R. 226, List of Exhibits, B-8).

degenerative disc disease, anxiety, hepatitis A, and right leg pain and was prescribed Tylenol #4.

Dr. Kuffa's notes state, "No Xanax til Dec. 08, 04."

Dr. Kuffa saw Plaintiff again on December 2, 2004 (R. 233). Plaintiff demanded more

Xanax, but notes from that visit reiterate that Plaintiff was not to receive Xanax until December

8, 2004. Notes from this visit also state, "Have pharmacy check since 10-04 how he got

Xanax." On December 27, 2004, Plaintiff was prescribed Tylenol #4 (R. 232).

On January 11, 2005, Plaintiff called the VA Hospital asking for a refill of his Vicodin

prescription (R. 193). The notes do not indicate whether the prescription was refilled (R.

193-94). Less than a week later, Plaintiff received a prescription for Tylenol #4 from Dr. Kuffa

(R. 231).

On January 27, 2005, Dr. Kuffa treated Plaintiff for osteoarthritis, right leg pain and

anxiety (R. 230). Plaintiff complained of right leg swelling and cramping after he shoveled his

sidewalk. The doctor diagnosed right lower extremity pain and prescribed Xanax, 1 mg.

Plaintiff returned two weeks later, and the doctor prescribed Tylenol #4 (R. 229).

On February 15, 2005, at his regular follow-up visit with Ihab Deebajah, M.D., at the VA

Hospital, Plaintiff denied feeling depressed and reported being compliant with his medications

with no problems (R. 186). His hypertension was noted as under "good control," his

hyperlipidemia was stable, his degenerative joint disease was treated with salsalate, Flexeril and

hydrocodone, and his depression monitored by the mental health clinic (R. 187-88). His

medications reportedly included amitriptyline, atenolol, cyclobenzaprine, hydrocodone,

lovastatin, and venlafaxine and "whatever was needed" was renewed. Plaintiff told a nurse in

the pain clinic that his pain level was less than 4 (R. 190). He also told the nurse that he walked

three times per week for exercise (R. 192).

In March 2005, Dr. Kuffa prescribed Tylenol #4 and Xanax, 1 mg (R. 228).  In May 2005, he prescribed Tylenol #4 and noted, "NO EARLY Xanax" (R. 227).  Two weeks later, Dr. Kuffa refilled Plaintiff's prescription for Xanax (R. 226).

In December 2005 Plaintiff complained at Drs. Kuffa and Ellsworth's office[3] of tooth pain (R. 245).  He was prescribed Tylenol #4 and Flexeril.  On December 22, 2005, Plaintiff reported that his leg was "killing" him, and Drs. Kuffa and Ellsworth's office prescribed Xanax, 1 mg and Tylenol #4 (R. 244).

Drs. Kuffa and Ellsworth's office again prescribed Tylenol #4 on January 18, 2006, when Plaintiff was seen for an upper respiratory infection (R. 243).  Five days later, Plaintiff returned to Drs. Kuffa and Ellsworth's office and reported losing his medications (R. 242).  Plaintiff was informed that lost or stolen medications could not be replaced.

In February 2006, Plaintiff was treated at Drs. Kuffa and Ellsworth's office for a gum infection (R. 241).  Plaintiff was diagnosed with gingivitis, inflamed gums, and anxiety.  He was prescribed Xanax, 1 mg and Keflex.

Plaintiff reported that his prescription for Xanax was stolen on March 20, 2006, as he left the pharmacy.  A couple of days later, in a subsequent visit to Drs. Kuffa and Ellsworth's office, Plaintiff was noted to have slurred speech and a sore throat (R. 240).  Plaintiff was prescribed vistril.  He was instructed that his Xanax could not be replaced and that if his urine test came back positive, "he's terminated."[4]

---

[3] The Administrative Record indicates that the treating notes marked as pages 238 to 258 are from Drs. Kuffa and Ellsworth, but the notes do not specify which doctor (R. 238-58, List of Exhibits, B-9).  Those records, therefore, are referred to as those of "Drs. Kuffa and Ellsworth."

[4] The office also wrote on this date that he would not be seen again until he paid his balance (R. 240).

On May 2, 2006, the last treating notes from Drs. Kuffa and Ellsworth's office, Plaintiff was treated for back problems, which he alleged "still hurts" (R. 239). He was prescribed Tylenol #4. The notes from this visit state, "!NO MORE Xanax!! [Plaintiff] tested positive for Xanax though he stated it was stolen !No MORE Xanax!!"

On July 18, 2006, Dr. Ellsworth completed a Medical Source Statement, diagnosing Plaintiff with a right shoulder impingement and a right tibia/fibia fracture displacement (R. 261). He asserted that Plaintiff could lift less than 10 pounds and could sit/stand less than 2 hours in an 8-hour day. He additionally opined that Plaintiff could sit continuously for 6 hours in an 8-hour day and that his ability to push/pull was moderately limited in his right upper extremities and mildly limited in his lower right extremities. Dr. Ellsworth asserted that these limitations would not at all disrupt a regular job schedule with low physical demands.

### 3. *Vocational Evidence*

VE McEachin indicated that Plaintiff's past work as an automotive assembly line worker is usually classified at the medium exertional level and is considered unskilled work (R. 132, 291). These skills are not transferable.

The ALJ first asked whether the following hypothetical would preclude an individual from performing Plaintiff's past work:

> Let me ask you to assume first of all a hypothetical individual who could do light work but has the further need to sit, stand, and have a sit/stand option every 30 minutes and no more than occasional overhead work or pushing and pulling with the upper extremities. That would be pushing and pulling controlled and those sorts of things as opposed to just moving objects around I guess. Postural restrictions would include no more than occasional bending, twisting, stooping, crouching, crawling.

The VE indicated it would preclude Plaintiff's prior work.

ALJ Mazzi then asked the VE to identify any jobs in the economy that an individual with the restrictions posed in his hypothetical could perform. The vocational expert testified that such an individual could perform light work as an inspector (30,000 jobs in the national economy) and packager (35,000 jobs in the national economy) (R. 23, 290-91). For the jobs identified, the vocational expert provided occupational codes from the *Dictionary of Occupational Titles* (R. 23, 291).

Plaintiff's counsel asked the VE to assume an individual that needed to lie down up to an hour during the working day and not during normal breaks (R. 292). VE McEachin testified that if an individual required unpredictable breaks or had to lie down during more than two 15 minute breaks and an hour long lunch, that individual would not be able to perform any of the previously identified jobs.

### 4.       *ALJ Mazzi's Decision*

ALJ Mazzi found that Plaintiff met the insured status requirement of the Social Security Act on February 12, 2003, and remained insured for Title II disability benefit purposes through June 30, 2006 (R. 23). Moreover, Plaintiff had not engaged in substantial gainful activity since February 12, 2003. The ALJ found the medical evidence establishes that Plaintiff has degenerative joint disease, status-post trauma, depression with anxiety, a history of infarcts of the frontal lobes of the brain and hypertension. He opined that the depression/anxiety and hypertension are "non-severe," but that the additional medically established disorders are severe.

The ALJ did not find Plaintiff's complaints of severe symptoms attributable to these non-severe impairments credible (R. 20). He noted that Plaintiff did not testify to severe secondary medical symptoms caused by the hypertension. The abnormal medical findings were minimal and did not support the level of emotional symptoms claimed. ALJ Mazzi further found that

12

Plaintiff's daily activities were inconsistent with his subjective complaints, and considered this inconsistency in determining Plaintiff's residual functional capacity (R. 22).

ALJ Mazzi considered the opinion of the Veterans Administration and of Plaintiff's treating physician, Dr. Ellsworth, but found that neither opinion was supported by the medical evidence (R. 21-22).  The ALJ noted that although Dr. Ellsworth indicated that Plaintiff had the ability to lift and carry less than ten pounds, Plaintiff testified at the hearing that he was able to lift up to eighteen pounds (R. 22).  ALJ Mazzi nonetheless accepted Dr. Ellsworth's diagnosis of a right shoulder impingement, and limited Plaintiff to occasional overhead work with the upper extremities.

The ALJ concluded that Plaintiff had the residual functional capacity to perform light work, involving occasional lifting up to 20 pounds, frequent lifting and/or carrying up to 10 pounds, standing and/or walking for 6 hours in an 8-hour day, and sitting for up to 6 hours in an 8-hour day (R. 20).  ALJ Mazzi additionally found that Plaintiff requires a sit/stand option every 30 minutes and is limited to occasional bending, twisting, stooping, crouching, crawling, and pushing and pulling with the upper extremities.  The ALJ further concluded that Plaintiff has a high school education, has no transferable skills in light of his past unskilled employment, and should be considered approaching advanced age, as he was just under 50 as of the date of the onset of his disability (R. 22-23).  20 C.F.R. § 404.1563(d).

Given Plaintiff's residual functional capacity, Plaintiff, by definition, would be unable to perform the full-range of light work under the Medical-Vocational Guidelines, Table No. 2. See 20 C.F.R. Pt. 404, Subpt. P, App. 2 and § 416.969.  Accordingly, the ALJ consulted a vocational expert to determine whether a significant number of jobs existed to accommodate Plaintiff's abilities and limitations (Step 5) (R. 23).  *See* 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); 20

C.F.R. §§ 404.1520(a)(4)(v) and 404.1560(c)(2).  Using Rule 202.13 as a framework and relying

on the vocational expert's testimony, the ALJ concluded that a significant number of jobs existed

in the economy that Plaintiff could perform.  *See* 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B),

20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c)(2), 416.920(a)(4)(v), and 416.960(c)(2).

Accordingly, it was the decision of ALJ Mazzi that Plaintiff has not been under a disability

within the meaning of the Social Security Act at any time on or after February 12, 2003, his all

alleged date of disability onset.

## II.   ANALYSIS

### A.   Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and

Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v.

Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.  A response to a flawed hypothetical

question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray Plaintiff's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the Plaintiff's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the Plaintiff."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

### B.    Factual Analysis

In his motion for summary judgment Plaintiff argues that ALJ Mazzi erred by not finding Plaintiff completely credible.  Plaintiff contends that the ALJ should have found Plaintiff could only perform sedentary, and not light work, and therefore the hypothetical posed to the VE by the ALJ, incorporating a light work restriction, was inaccurate.  In addition, Plaintiff argues that the ALJ rejected the opinion of Dr. Ellsworth, a treating physician, in violation of  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  Plaintiff asserts that Dr. Ellsworth's opinions, as expressed in the Medical Source Statement, are consistent with sedentary, not light, work, and, therefore, that the hypothetical question posed to the vocational expert, was inaccurate.

### 1.    Plaintiff's Credibility

Subjective evidence is only considered to "the extent . . . [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)). The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling

pain when such testimony is not supported by the record.  *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  The issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion.  *Kirk v. Secretary of health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In order for an ALJ to properly discredited a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons.  S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific.  The ALJ must say more than the testimony is not credible.  *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain.  *Id*. at 1039.

Contrary to Plaintiff's assertion, the ALJ in this case considered all of Plaintiff's symptoms in accordance with 20 C.F.R. § 404.1529 and SSR 96-7p, and had substantial evidence from the critical time period to discredit Plaintiff's subjective testimony.  The ALJ used a two-step process to evaluate Plaintiff's symptoms (R. 22).  *See Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ determined if there was an underlying medically determinable physical condition or mental impairment that could reasonably be expected to produce Plaintiff's pain.  *See* 20 C.F.R. §§ 404.1529(b) and 416.929(b)(describing need for medically determinable impairment that could reasonably be expected to produce the alleged symptoms); *Rogers*, 486 F.3d at 247.  Second, the ALJ determined whether Plaintiff's

16

statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence and credible based upon the entire record. 20 C.F.R. §§ 404.1529(c) and 416.929(c) (all relevant evidence used to weigh intensity, persistence, and functionally limiting effects of symptoms); *Rogers*, 486 F.3d at 247. Accordingly, in determining Plaintiff's residual functional capacity, the ALJ discussed the medical evidence and contrasted that with Plaintiff's testimony and other evidence regarding his pain and limitations (R. 19-23). *See* 20 C.F.R. §§ 404.1545 and 416.945 (declaring that the ALJ must weigh medical evidence and statements about symptoms to determine the residual functional capacity).

The ALJ concluded that, while Plaintiff's impairments could reasonably be expected to produce the symptoms Plaintiff alleged, his statements regarding his symptoms were not substantiated by the objective medical evidence and the record as a whole (R. 22). Consequently, the ALJ concluded that the statements were not fully credible (R. 19-20). The ALJ's reasons for this conclusion are supported by the record.

The medical evidence shows that Plaintiff's depression was related to the cessation of Plaintiff's social security benefits and not due to any underlying psychiatric disorder, and, in fact, Plaintiff testified at the hearing that he was not taking medication for depression and that his mental state was getting better (R. 19-20, 203-07, 285). The medical evidence also indicates that Plaintiff was abusing Xanax, and his prescription was discontinued by his doctor as a result, suggesting that the doctor believed that Plaintiff's symptoms were adequately managed with moderate amounts of medication or no medication (R. 19-20, 239). It also raises the question of whether Plaintiff exaggerated his symptoms as part of drug seeking behavior for tranquilizers and codine based pain medication.

17

The medical evidence further shows that while multiple traumas had resulted in degenerative changes that reduced Plaintiff's physical capacity to the light level, the abnormal clinical signs were consistent with the earlier traumas and not of a severity to prevent light work (R. 21).  Radiology reports from April 2002, for example, revealed an old fracture in the right leg and spondylosis at C5-C6 (R. 21, 197-98); an MRI of the brain in July 2003 showed findings compatible with old infarcts but no evidence of acute processes (R. 21, 246-47); and an April 2004 x-ray again revealed an old fracture in the right leg but no new fracture or dislocation (R. 22, 152).

ALJ Mazzi also observed that Plaintiff's conservative treatment was inconsistent with Plaintiff's allegations regarding the severity of his symptoms (R. 22).  For example, the medical evidence shows that Plaintiff's treatment consisted almost exclusively of prescription medication, primarily Tylenol #3 or #4 (R. 153-62, 226-45), and, with the exception of mental health, it does not appear that Plaintiff ever received or sought out any other kind of treatment (R. 239).  *See Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) (ALJ reasonably relied on Plaintiff's conservative treatment in assessing credibility).

The ALJ additionally found that Plaintiff's reports of his activities were inconsistent with his allegations regarding the severity of his symptoms (R. 22).  *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).  Plaintiff's daily activities reportedly included doing household chores, walking, watching television, attending church and AA meetings, and performing outdoor work, including shoveling snow and mowing the yard (R. 22, 230, 285-89).

Given the medical evidence and reports of Plaintiff's activities, discussed in detail by the ALJ, substantial evidence supports the ALJ's credibility finding and resulting residual functional capacity determination.  *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); *Buxton*, 246 F.3d at

772-73 (stating that substantial evidence presupposes a zone of choice within which the ALJ can go either way without interference by the courts). For the reasons articulated by the ALJ, substantial evidence supports the ALJ's findings limiting Plaintiff to light, and not sedentary, work. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (stating that a claimant's credibility may properly be discounted where the ALJ finds contradictions among the medical reports, claimant's testimony and other evidence); *Rogers*, 486 F.3d at 247 (noting that whenever a claimant's complaints regarding symptoms, or their intensity or persistence, are unsupported by the medical evidence, the ALJ must make a credibility determination based on the entire record).

### 2.    Plaintiff's Treating Physicians

Plaintiff argues that the ALJ rejected the opinion of Dr. Ellsworth, a treating physician, in violation of 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Plaintiff asserts that Dr. Ellsworth's opinions, as expressed in the Medical Source Statement, are consistent with sedentary, not light, work, and, therefore, that the hypothetical question posed to the vocational expert, was inaccurate.

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie*

*v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.

1980). The administrative decision could reject a properly supported treating physician's opinion

of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of*

*HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally

give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20

C.F.R. §404.1527.  The Commissioner will only be bound by a treating source opinion when it is

"well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See*

*also*, S.S.R. 96-2p.

Yet, the conclusion of whether a Plaintiff is "disabled" is a decision reserved to the

Commissioner to decide (R. 19).  20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2).  And,

"[w]e will not give any special significance to the source of an opinion on an issue reserved to

the Commissioner." *Id*. at §§ 404.1527(e)(3), 416.927(e)(3).  Here, the ALJ weighed Dr.

Barker's opinion in accordance with controlling law, and he determined Plaintiff could do a

range of light work (R. 24-27, 30).  The regulations and case law recognize that the opinion of a

physician, including a treating physician, is entitled to great weight only if it is supported by

adequate medical data, including medical signs and laboratory findings, and does not conflict

with other evidence.  20 C.F.R. § 404.1527(d)(2)(3)(4); *Walters*, 127 F.3d at 530.

Here, the ALJ found that Dr. Ellsworth's opinion that Plaintiff could not lift more than 10

pounds or walk more than 2 hours in an 8 hour day (R. 261) was contradicted by Plaintiff's own

testimony that he could lift up to 18 pounds (R. 287) and x-ray evidence showing an old, healed

right leg fracture (R. 22, 152, 197).[5]  The ALJ also concluded that there was no medical evidence

to support the diagnosis of a right shoulder impingement (R. 22).  Substantial evidence,

therefore, supports the ALJ's finding that Dr. Ellsworth's opinion was not supported by the

medical evidence and should not be given controlling weight.[6]  *See* 20 C.F.R. §§ 404.1527(d)(2)

and 416.927(d)(2); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (stating that

if a treating physician's opinion is not supported by objective medical evidence, the ALJ is

entitled to discredit the opinion as long as he sets forth a reasoned basis for doing so).

## III.    RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary

Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.  The

parties to this action may object to and seek review of this Report and Recommendation, but are

required to file any objections within ten (10) days of service of a copy hereof as provided for in

28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard*

*v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638

F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others

---

[5] Plaintiff suggests that the ALJ failed to consider an April 2004 x-ray report of the right leg and contends that it shows a worsening of Plaintiff's condition (Dkt. #9, pp. 11-12).  In discussing the right leg fracture, however, the ALJ referred to "x-rays," suggesting he considered the April 2002 report as well as the April 2004 report (R. 22, 152, 197).  Even if he had not, there is no medical opinion in the record supporting the charge that Plaintiff's condition worsened, and nothing in the two reports facially presents any evidence of such a change (R. 152, 197).  Both report an old, healed fracture (R. 22, 152, 197).

[6] Plaintiff asserts that the ALJ only discredited Dr. Ellsworth's opinion because of the lack of medical evidence supporting the diagnosis of a right shoulder impingement.  (Dkt. #9, p. 10).  As discussed above, the ALJ rejected Dr. Ellsworth for other reasons as well, including Plaintiff's contradictory testimony that he could lift up to 18 pounds (R. 22, 287) and x-ray evidence showing an old, healed fracture (R. 22, 152, 197).

with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 25, 2009                                    s/ Steven D. Pepe_____
Ann Arbor, MI                                           United States Magistrate Judge

Certificate of Service

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 25, 2009 .

                                    s/Jermaine Creary_____
                                    Interim Case Manager